162

419 A.2d 711

**COMMONWEALTH of Pennsylvania**

v.

**Nathaniel BEATTY, Appellant.**

Superior Court of Pennsylvania.

Submitted April 12, 1979.

Filed April 25, 1980.

Elmer S. Beatty, Jr., Pittsburgh, for appellant.

Robert L. Eberhardt, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before VAN der VOORT, SPAETH and WATKINS, JJ.

SPAETH, Judge:

This is an appeal from an order denying post–conviction relief. Appellant's contention is that his trial counsel was ineffective.

Appellant's trial was before a judge sitting without a jury. The facts developed at trial were as follows. On March 16, 1976, appellant, armed with a gun and his face masked by a cap, entered a liquor store in Pittsburgh and ordered a clerk to fill a paper bag with money. Observing police outside the store, appellant took the bag of money, put his hand around the clerk's throat, and with his gun to the clerk's head, left the store, using the clerk as a shield against the police. The clerk was dragged backwards for several blocks, until appellant fired his gun at the police, giving the clerk an opportunity to get free. Appellant was subsequently wounded and apprehended by the police.

The trial judge convicted appellant of robbery,[1] kidnapping,[2] and aggravated assault.[3] Appellant filed a motion in arrest of judgment, but this later was withdrawn, and no direct appeal was taken.

On December 7, 1977, appellant filed a petition under the Post Conviction Hearing Act.[4] Among the allegations in the petition were the following:

4. Counsel failed to raise or put at issue the fact that Petitioner was under the direct influence of alcohol and narcotics at the time of the offenses occasioned and which had an impact upon the judgment and rationality of Petitioner and aided in any disposition he latently harbored to act criminally.

On April 18, 1978, the lower court held a hearing on the petition. On June 6, 1978, the court denied the petition. Appellant filed the present appeal and on September 19, 1978, the lower court filed its opinion.

1

In reviewing a contention that counsel was ineffective, we use a two tier analysis. First, we determine whether the claim that counsel is charged with not pursuing had "arguable merit." Where it is determined that the claim did have arguable merit, we proceed to the second tier, and determine whether counsel's failure to pursue the claim had any reasonable basis. Where no reasonable basis appears, the conclusion follows that the defendant was denied his right to effective counsel. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977); *Commonweatlh v. Ramsey*, 259 Pa.Super. 240, 246, 393 A.2d 806, 809 (1978).

In its opinion the lower court states that evidence that appellant was intoxicated was "irrelevant." For this proposition the court cites 18 Pa.C.S.A. § 308 and *Commonwealth*

1. 18 Pa.C.S. § 3701.

2. 18 Pa.C.S. § 2901.

3. 18 Pa.C.S. § 2702.

4. 19 P.S. § 1180–1 *et seq.* (Supp.).

*v. Pickett,* 244 Pa.Super. 433, 368 A.2d 799 (1976). (Record at 56a) If the lower court were correct in this statement, we could reject without further consideration appellant's contention that his trial counsel was ineffective, for a claim supported by irrelevant testimony could not have "arguable merit." In fact, however, the lower court's statement is incorrect.

Effective April 7, 1976, 18 Pa.C.S.A. § 308 was amended to provide:

> Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.

Had the incident in question here occurred on or after April 7, 1976, the lower court would have been correct in stating that evidence that appellant was intoxicated was irrelevant. However, the incident occurred on March 16, 1976. On that date, 18 Pa.C.S. § 308 provided:

> Intoxication or drugged condition are not, as such, defenses to a criminal charge; but in any prosecution for any offense, evidence of intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to negative an element of the offense.

Consequently, if appellant's trial counsel had evidence that appellant was at the time of the incident intoxicated or in a drugged condition, that evidence might have been "relevant to negative an element" of one or more of the offenses--robbery, kidnapping, and aggravated assault--with which appellant was charged.

Our decision in *Commonwealth v. Pickett, supra,* is not contrary to but rather confirms this conclusion. In *Pickett* we ordered a new trial because in a burglary and theft case, the lower court had refused to submit a requested point for charge on intoxication as a possible defense. Noting that

the charges arose out of an incident occurring before April 7, 1976, we said:

> Our failure to remand for a new trial would involve the most obvious violation of the constitutional provision against *ex post facto* laws. Prior to April 7, 1976, a person was not guilty of a crime if he were sufficiently intoxicated so that he could not form the requisite intent. The legislature had the authority to change the law, but not as applied to offenses committed before the effective date of the amendment. Thus error in denying the charge was clearly harmful.

244 Pa.Super. at 440, 368 A.2d at 802.

## 2

■ Given that as a matter of law, evidence of intoxication or drugged condition might have been relevant in appellant's defense, we must undertake the two tier analysis of determining (a) whether in this particular case the evidence was such that the defense would have had "arguable merit," and (b) if it would have had arguable merit, whether appellant's trial counsel's failure to present it had a reasonable basis.

### a

At the post–conviction hearing, appellant testified that from about 2:00 p. m. to 6:00 p. m. on the day of the incident, he was in Barb's Lounge, drinking whiskey and smoking marijuana. (R. 20a) On direct examination, he indicated that he had drunk "quite a lot" (id.); on cross–examination, he said that "[w]e were drinking in shots," and that he had consumed "at least a pint, a pint and a half" (R. 26a) He said that he had smoked two marijuana cigarettes, which seemed to have no effect on him, and that then

> one of the girls that was in the crowd that we were in, they–she took the cigarette and put it inside her mouth and told me to kiss her, and I did, which she blow the smoke in and the thing went straight to my head. And from that it just seemed like that everything was more or less a fantasy.

(R. 24a)

Appellant was asked whether he had told his trial counsel about his drinking and smoking, and he replied as follows:

Q: And did you make Mr. Freeland aware anytime of the fact that you had been drinking and smoking, or that you were a diabetic?

A: Yes, I did.

Q: Do you recall any of the discussions though that you had with him?

A: Well, the only real discussion that me and Mr. Freeland had–because I visited his office twice–and I made him aware of the fact that I was drinking and I had been smoking that night. But this is primarily the only real discussion that we had. As far as any defense or anything, we never did discuss it. He seemed more interested in my military transcript than on the present case I was on.

Q: In any event, was this–did you ever discuss with him presenting this as a possible defense or evidence at your trial?

A: No.

(R. 22a–23a)

Appellant also presented at the post conviction hearing the testimony of Geri Hardwick. She said that she had been in Barb's Lounge until a little before 1:00 p. m. for "about three hours." (R. 10a), and during this period had seen appellant drinking and smoking:

Q: Okay. What kind of drink did you observe him having?

A: Well, I know he drank liquor, you know, because I had bought him a drink.

Q: Was he taking it in shots or in a mixed drink.

A: He was taking it in shots.

Q: Could you tell us how many shots you saw him drink?

A: I seen him drink quite a few shots. I can't remember how many, you know, but it was quite a few shots.

Q: Did you see him smoke Marijuana, or reefer, as you say?

A: Yes, I did.

Q: Do have any idea of how many?

A: It was more than two.

Q: Now, did you observe whether or not these things had any effect upon his behavior right there before you?

A: Yes. Yes, I would say it did . . . . Well, he was like laughing more, you know, like he was really happy, you know, talking a lot more.

(R. 12a)

The remaining witness at the post–conviction hearing was appellant's trial counsel, called by the Commonwealth.

Counsel acknowledged that appellant had told him that he had been drinking and smoking marijuana. (R. 36a, 39a–40a) He said, however, that "at no time do I remember [appellant] saying that he had been at Barb's Bar or any other particular bar he went to." (R. 38a) Asked whether he had "explore[d] how much [appellant] had consumed," he answered, "My notes don't reflect it. I don't know how much I went into it." (R. 40a) Also, with respect to appellant's smoking, counsel said, "[Appellant] did tell me he found a Marijuana cigarette in his glove compartment of his car, that someone left there, and he smoked it." (R. 39a–40a) Counsel first saw appellant in a hospital, "on Friday or Saturday after the incident." (R. 36a) At that time, he said, he knew that appellant was diabetic, and was receiving medication for diabetes. (R. 36a–37a)

Counsel further testified that appellant "merely had a rather hazy recollection of what happened about the offense." (R. 36a) He said that he "considered [appellant's] conduct on this particular day aberrational" (R. 37a), and therefore sent appellant to a psychiatrist, Dr. Eugene L. Youngue (id.). According to counsel: "[Appellant] is a well–spoken, amiable–as I told him to his face–an amiable giant. And this was just out of sort for the person I saw in my office and saw in the hospital. So I did go into it.

That's why, as I said, that's why I suggested a psychiatric examination." (R. 38a) Dr. Youngue's written report to counsel was produced at the post–conviction hearing, and the following paragraph from it was read into the record:

In my opinion, this patient has a severe character disorder. It is my opinion that a patient who shows such a disturbance in character organization could, on becoming drunk, and then smoking a hallucinogin, become totally unaware of his actions and not remember them.

(R. 43a)

The foregoing establishes two facts. First: While counsel may not have known the details, he did know enough to have concluded preliminarily that appellant's conduct had been aberrational and might be attributable to his having become drunk and then smoking marijuana. And second: This preliminary conclusion was, after a psychiatric examination, confirmed by Dr. Youngue. The question therefore arises: Why, at appellant's trial, did not counsel offer Dr. Youngue's testimony as "evidence of [appellant's] intoxication or drugged condition  .   .   .   relevant to negative an element of the offense[s]" with which appellant was charged?  18 Pa.C.S.A. § 308.  Clearly, such a claim would have "arguable merit."  *Commonwealth v. Pickett, supra.*

b

In determining whether appellant's trial counsel's failure to present Dr. Youngue's opinion of appellant's condition had a reasonable basis, we must be guided by counsel's testimony at the post conviction hearing.

At the post–conviction hearing, counsel testified that he had not received Dr. Youngue's written report until "sometime after the trial." (R. 41a)  This fact, however, does not explain counsel's failure to call Dr. Youngue to testify at the trial, for counsel acknowledged that he had spoken to Dr. Youngue before the trial. (R. 43a)  Counsel did agree to the suggestion that Dr. Youngue's pre–trial oral report of appellant's condition "was not precisely the same" as his post–trial written report (R. 44a);  also, he said that the "specific language" read into the record from the written report was

not in the oral report (R. 43a). However, he was unable to recall what the specific language of the oral report was, stating that Dr. Youngue "had said that there was something wrong with [appellant's] affective responses and he had–he had some classification. I can't tell you beyond that because I don't recall." (R. 44a) The Commonwealth asserts in its brief that Dr. Youngue's "oral pre–trial report differed substantially from the later written report, according to counsel's testimony." Commonwealth's Brief at 11. This assertion is not supported by but is rather inconsistent with the record, which discloses no basis for saying that Dr. Youngue ever expressed inconsistent opinions, in his written report stating that "on becoming drunk, and them smoking a hallucinogin, [appellant would] become totally unaware of his actions," but in his oral report stating something different.

The real basis for counsel's failure to call Dr. Youngue to testify at appellant's trial appears to have been that counsel did not realize that under the law *as of the time of the incident in question, Commonwealth v. Pickett, supra,* as distinguished from *as of the time of trial,* evidence of appellant's intoxication or drugged condition might be relevant to negative the element of intent. (In this respect, counsel appears to have made the same mistake as the lower court, which, as has been discussed above, also mistakenly characterized such evidence as "irrelevant.") Instead, counsel seems to have focused on the possibility of some sort of insanity defense. Thus at one point counsel testified: "I discussed the matter with Dr. Youngue before the trial and I determined that under the M'Naghten Rule, a diminished responsibility, or any other concept, that I was pretty much out of luck." (R. 37a) At another point counsel testified as follows:

Q: Okay. Now, you received the written report prior to sentencing though?

A: Yes.

Q: Okay. And you chose not to present that written report into evidence prior to sentencing?

A:  That's right.

Q:  Is there any reason why you would choose not to do that?

A:  Well, there are some Judges upon whom psychiatrists' reports have a greater effect than others. And I haven't classified them. And again, as I said, I've got to tell you frankly I didn't think it would do any good. And it may well have, but that's a judgment I can't make. I made the judgment then that it was inappropriate for me at that time to have Dr. Youngue come in to talk about these kinds of things.

Q:  Had you been aware of that opinion in the written report prior to trial, would you have called Dr. Youngue as a witness?

A:  Prior to trial?

Q:  Yes, if you had that written report before you at that time?

A:  No. You see, there is a difference between, you know, defending and then not remembering. You see, that's really the problem. Not remembering is not a new symptom to me. And that really wasn't the crucial issue. The crucial issue was when the evidence was–and again this is my thinking then and my memory–but at that time, you know, here are the physical facts: Here's a man in a liquor store, with a mask on, a few minutes thereafter the mask is off and he is identified. You know, whether he remembers what he did or not, in my mind, was not crucial to his guilt or innocence, given the fact that I could not support it with psychiatric testimony. But that's the way it looked at that time.

(R. 44a–46a)

Counsel was of course correct that "whether [appellant] remember[ed] what he did or not . . . was not crucial to his guilt or innocence." The issue, however, was not whether appellant *remembered* what he had done, but whether, when he did it, he *understood* what he had done. That issue *was* crucial to appellant's guilt or innocence, and

on that issue, it was Dr. Youngue's opinion that "on becoming drunk, and then smoking a hallucinogen, [appellant would] become totally unaware of his actions."

We recognize that the trier–of–fact (judge or jury, as the case might be) might have rejected Dr. Youngue's opinion. We also recognize that we should never engage in "hindsight evaluation of the record." *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604–05, 235 A.2d 349, 352–53 (1967). Nevertheless, the fact remains that appellant's trial counsel's testimony does not suggest, nor have we been able to discern, any reasonable basis for not at least submitting Dr. Youngue's opinion to the trier–of–fact; it represented, so far as we can tell, the only possible defense appellant had.

The order of the lower court is reversed, the judgment of sentence is vacated, and the case is remanded for new trial.[5]

WATKINS, J., dissents.

---

5. As indicated by counsel's testimony, quoted *supra*, counsel did not submit Dr. Youngue's opinion at the sentencing proceeding. Appellant has argued that this failure also represented ineffective assistance of counsel. Given our conclusion that a new trial is required, we do not reach this argument.